[Cite as *State v. Pelfrey*, 2022-Ohio-721.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29289 |
| | : | |
| v. | : | Trial Court Case No. 2015-CR-1306 |
| | : | |
| GREGORY D. PELFREY | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 11th day of March, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ELIZABETH A. ELLIS, Atty. Reg. No. 0074332, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

GREGORY D. PELFREY, Inmate No. A732-759, Noble Correctional Institution, 15708 McConnelsville Road, Caldwell, Ohio 43724
    Defendant-Appellant, Pro Se

. . . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** Defendant-Appellant, Gregory Pelfrey, appeals from a trial court order overruling his request for leave to file a motion for new trial. In support of his appeal, Pelfrey has presented 16 assignments of error, many of which are repetitive and are barred by res judicata. For the reasons discussed below, we conclude that the trial court did not err in refusing to let Pelfrey file a motion for a new trial. Accordingly, the judgment of the trial court will be affirmed.

## I.  Facts and Course of Proceedings

### A.  Original Proceedings in State Court

**{¶ 2}** Our prior opinion in this case stated that Pelfrey was indicted in November 2015 on the following charges: "(1) theft from an elderly or disabled adult ($37,500 or more, but less than $150,000/ beyond scope of consent), in violation of R.C. 2913.02(A)(2) (Count 1); (2) forgery (uttering a forged power of attorney), in violation of R.C. 2913.31(A)(3) (Count 2); and (3) theft from an elderly or disabled adult ($37,500 or more, but less than $150,000/ deception), in violation of R.C. 2913.02(A)(3)." *State v. Pelfrey*, 2d Dist. Montgomery No. 27474, 2018-Ohio-2427, ¶ 16 (*Pelfrey I*).

**{¶ 3}** These charges related to a power of attorney (POA) that Pelfrey's 73-year old grandmother, Judith Daniel, had signed in 2014. Pelfrey used the POA to obtain a $75,000 loan from a private lender (ostensibly to make repairs to Daniel's property), and a mortgage lien in that amount was placed on Daniel's property. However, Daniel never received any money and no repairs were made. Ultimately, Daniel could not pay back

the mortgage; she then executed a quit claim deed to the lender, losing the home she had lived in since 1967. *Id.* at ¶ 4-14.

{¶ 4} Regarding the POA, our opinion related the following additional facts:

National Title Company in Centerville, Ohio, closes loans for people when they buy and sell real property. National Title's owner, Ray Woodie, also arranges loans for individuals through a network of private lenders; these loans usually involve situations where the borrower intended to "flip" the property, i.e., sell it again quickly. Woodie had previously arranged for private loans for Greg Dart, an acquaintance of Daniel's grandson, Pelfrey. In February 2014, Dart contacted Woodie, asking if Woodie could arrange for Pelfrey to obtain a private loan. Pelfrey told Woodie that he was going to fix up his grandmother's house. Woodie arranged for Pelfrey to obtain a $75,000 loan from Troy Pinkerton, a participant in Woodie's private network of lenders; Daniel's house would serve as security for the loan.

On March 31, 2014, Pelfrey went to National Title to close on the private loan. When Pelfrey did not bring his grandmother to National Title and did not have a power of attorney for her, Woodie told Pelfrey that it was necessary to have Daniel's power of attorney to close on the loan.

According to Daniel, that same day (March 31), Pelfrey approached her about signing a power of attorney. Pelfrey told Daniel that he had sold his business to Dart for $100,000, but that Dart was not going to pay the first $50,000; instead, Dart would fix Daniel's house. Pelfrey told Daniel

that he needed her to sign a power of attorney so that he could authorize Dart to perform the work. Daniel testified that, on March 31, she picked up Pelfrey at his girlfriend's residence, and they drove to a bank where Daniel had a document notarized granting Pelfrey a power of attorney for that one day. Daniel was apprehensive about the power of attorney and called Pelfrey afterward to see if he had used it; Pelfrey told Daniel that he had not.

On April 1, 2014, Woodie received a phone call from a man identifying himself as Pelfrey, asking Woodie to explain the transaction to his grandmother. Woodie spoke to the woman on the phone, and he believed he was talking to Daniel. At trial, Daniel denied that she had spoken with Woodie.

Later that day (April 1), Pelfrey returned to National Title with the power of attorney. While there, Pelfrey, as attorney in fact for Daniel, closed on a one-year $75,000 loan from Pinkerton; neither Daniel nor Pinkerton was present. Under the terms of the promissory note, Daniel agreed to pay Pinkerton $991.13 for 12 months, followed by a balloon payment of $71,390.40 on April 1, 2015. The note was secured by a mortgage on Daniel's residence. Pelfrey received a check made payable to Daniel for $71,174 from National Title. (The check was not for the full $75,000 due to closing costs.) Daniel testified that she never would have signed the power of attorney if she knew Pelfrey were going to obtain a

mortgage loan and that she only signed the power of attorney because of his statement that it was needed for Dart to do repairs on her home.

The power of attorney presented to Woodie and recorded with the Warren County Recorder's Office was dated and notarized on April 1, 2014. At trial, Daniel acknowledged that her initials and signature were on the document, but she said it looked different from the one she had signed. Daniel had previously told Detective Daniel Osterfeld of the Centerville Police Department that Pelfrey had approached her about the power of attorney on April 1, not March 31.

The record does not reflect when the check to Daniel was cashed and how the check was spent, but no money was provided to Daniel. Daniel testified that Dart and Pelfrey came to her home a couple of times to discuss possible repairs. Daniel called Pelfrey the day after they had spoken about the repairs, and she told Pelfrey to stop the work on her house, because she did not think $50,000 would cover it. Daniel testified that somebody built a small deck on the front of her house (but did not finish it), and a little room was built in her garage; she thought that the builder worked for Dart. It is unclear when that work on her house occurred.

On June 13, 2014, Daniel learned that the power of attorney had been used to secure a loan and that there was a lien on her house. Daniel also received correspondence from the Warren County Recorder's Office, which prompted her to call Pelfrey; Pelfrey came to Daniel's residence, took

the correspondence, and said that he would take care of it. However, Daniel repeatedly received bills from Pinkerton that she was unable to pay.

At some point, Daniel spoke with Detective Osterfeld about the power of attorney and the lien on her house. Osterfeld spoke with Pelfrey about the March 31/April 1 transaction in late November 2014.

*Pelfrey I*, 2d Dist. Montgomery No. 27474, 2018-Ohio-2427, at ¶ 5-13.

{¶ 5} In November 2015, Pelfrey was indicted on three charges associated with this transaction. At the time of the indictment, Pelfrey was incarcerated in Kentucky on unrelated charges and was not served with the indictment. However, Pelfrey later asked to be returned to Ohio to face the charges; he was then returned and arraigned in the trial court in July 2016. *Id.* at ¶ 16 and 19.

{¶ 6} Previously, in February 2016, Pelfrey had convinced a girlfriend to prepare a false affidavit to help him get the charges dismissed. The affidavit claimed the girlfriend had a sexual relationship with Dart, that Dart was "behind" the POA and loan, and that Dart had misled Pelfrey.[1] After the girlfriend gave the police information about this affidavit, the State filed another indictment in October 2016, charging Pelfrey with tampering with evidence. *Id.* at ¶ 15, 18, 20, and 27.

{¶ 7} In late summer 2016, Pelfrey convinced another woman to prepare a forged agreement related to the loan. This agreement, which was dated April 1, 2014, was designed to implicate Dart for the alleged crimes and was given to Pelfrey's attorney, who forwarded it to prosecutors. *Id.* at ¶ 22-25. In addition, Pelfrey convinced this woman

---

[1] The girlfriend testified at trial that these statements were untrue and "that she did not know Dart when she prepared the affidavit." *Pelfrey I* at ¶ 20.

to text an individual "(presumably Dart)" to instruct him not to lie about the transaction. However, the woman did not know who she was texting. *Id.* at ¶ 24. After learning these facts, the State filed yet another indictment in mid-November 2016, charging Pelfrey with tampering with evidence. *Id.* at ¶ 28.

{¶ 8} In early 2017, the court held a jury trial on all the charges, and the jury found Pelfrey guilty as charged. After merging some counts, the court sentenced Pelfrey to a total of 13 years in prison. *Id.* at ¶ 33-34. Pelfrey then appealed, raising five assignments of error, including "that (1) the trial court erred in excluding his expert witness, (2) the trial court erred in denying his motion to continue the trial, (3) his convictions were based on insufficient evidence and against the manifest weight of the evidence, (4) the trial court violated his right to a speedy trial, and (5) the trial court erred in allowing parol evidence regarding the power of attorney." *Id.* at ¶ 2. After reviewing the record, we rejected the assignments of error and affirmed the convictions on June 22, 2018. *Id.*

{¶ 9} Pelfrey appealed our judgment to the Supreme Court of Ohio, but the court declined review. *See State v. Pelfrey*, 153 Ohio St.3d 1475, 2018-Ohio-3637, 106 N.E.3d 1261.


B. Post-Conviction Proceedings in State Court

{¶ 10} As noted, we affirmed Pelfrey's convictions in June 2018. While the direct appeal was pending, Pelfrey filed a motion for post-conviction relief in the trial court on March 27, 2018, alleging ineffective assistance of counsel, prosecutorial misconduct, and

witness misconduct. Concerning ineffective assistance, Pelfrey alleged that trial counsel should have verified the actual date the POA was signed by obtaining records from the bank where the POA was signed and from the notary. According to Pelfrey, this would have been relevant to show that the POA was not forged and that the dates on the POA were not changed from March 31, 2014 to April 1, 2014. Petition to Vacate or Set Aside Judgment of Conviction or Sentence (Mar. 27, 2018), p. 3-4.[2] In addition, the petition alleged that trial counsel "failed to investigate an alibi that would have place [sic] [Pelfrey in] a different location on the alleged day * * * the conduct in question was committed." *Id.* at p. 4.

{¶ 11} Specifically, Pelfrey claimed that he could not have been with his grandmother on the day she was alleged to have signed the POA (March 31, 2014), because he was in Cincinnati with another woman (Eileen Cable) and was meeting with an attorney (Charles Lester). *Id.* Pelfrey attached Lester's March 23, 2017 letter to the petition. *See* Appendix C attached to the petition. The content in the letter was largely redacted, other than a statement which said that Lester had a "calendar entry" showing that Pelfrey had an appointment with Lester on March 31, 2014. However, no affidavits were submitted with the petition.

{¶ 12} The State filed an answer to the petition on April 11, 2018, and filed a motion for summary judgment on April 16, 2018. The trial court filed a decision on May 15, 2018,

---

[2] Pelfrey's grandmother, Judith Daniel, testified that she signed the POA on March 31, 2014, but the POA was dated April 1, 2014, which is the date Pelfrey closed on the loan. *Pelfrey I*, 2d Dist. Montgomery No. 27474, 2018-Ohio-2427, at ¶ 7 and 9 Daniel also testified that the POA Pelfrey used did not look the same as the one she had signed, and that she would never have signed the POA for a loan; instead, Pelfrey told her it was necessary so a contractor could repair her property. *Id.* at ¶ 9-10.

dismissing the petition for post-conviction relief.   *See* Decision, Order, and Entry (May 15, 2018) (*Pelfrey II*).   Concerning the claims in the petition, the court found that they were barred by res judicata because they could have been raised on direct appeal. Alternatively, the court found that Pelfrey had failed to submit any evidence sufficient to establish the claims.   *Id.* at p. 7-9.   No appeal was taken from that decision.

### C.   Further Proceedings in the Direct State Court Appeal

{¶ 13} As indicated, Pelfrey appealed to the Supreme Court of Ohio from our decision in the direct appeal, *Pelfrey I*.   While that appeal was pending, Pelfrey filed a pro se application to reopen his direct appeal on July 18, 2018, based on a claim of ineffective assistance of counsel.   In particular, Pelfrey alleged that appellate counsel should have included a claim of prosecutorial misconduct.   Application to Reopen, p. 2.[3] Pelfrey also attached various documents to the application.   Among other things, he included an October 1, 2014 letter from Daniel's attorney to the Centerville, Ohio police; a partially redacted Centerville, Ohio police report showing entries from August and October 2014; a January 3, 2018 letter to Pelfrey from Disciplinary Counsel of the Supreme Court of Ohio; part of a June 24, 2014 letter from Daniel's attorney to Pelfrey; and copies of the front and back of a check from National Title to Daniel.

{¶ 14} On September 12, 2018, the Supreme Court of Ohio declined to review Pelfrey's appeal.   About a week later, we denied the motion to reopen, finding there was no reasonable probability that Pelfrey would have prevailed on the attorney misconduct

---

[3] Pelfrey made other claims as well, but they are not relevant to our discussion.

claim if it had been raised on appeal.   *State v. Pelfrey*, 2d Dist. Montgomery No. 27474 (Decision & Entry, Sept. 19, 2018) (*Pelfrey III*), p. 5.   In this regard, we said that:

> There is nothing in the record to suggest that Daniel knowingly made false statements under oath when she testified that she executed a power of attorney on March 31, 2014 (rather than April 1, 2014), and that the power of attorney that was recorded and presented at trial appeared different from the one she had signed.   We cannot conclude that Daniel's testimony was perjured simply because there was evidence from which the jury could have concluded that Daniel was mistaken in her testimony and that the power of attorney was not, in fact, altered.

*Id.* at p. 5-6.

{¶ 15} Shortly thereafter, we also denied Pelfrey's application for reconsideration, because it was untimely.   *State v. Pelfrey*, 2d Dist. Montgomery No. 27474 (Decision & Entry, Nov. 2, 2018) (*Pelfrey IV*), p. 2.   In addition, we denied the motion for reconsideration on its merits.   *Id.* at p. 2-4.   Pelfrey appealed both *Pelfrey III* and *IV* to the Supreme Court of Ohio, but the court declined review on January 23, 2019.   *State v. Pelfrey*, 154 Ohio St.3d 1482, 2019-Ohio-173, 114 N.E.3d 1208.   From there, Pelfrey filed suit in federal court.[4]

## D.   Federal Court Proceedings

---

[4] Under established law, we may take judicial notice of records and judicial opinions that can be accessed on the internet.   *E.g., Worthington v. Admr., BWC.*, 2021-Ohio-978, 169 N.E.3d 735, ¶ 11, fn. 2 (2d Dist.)   All the cases and information we have referenced and will reference are available online.

{¶ 16} On February 26, 2019, Pelfrey filed a pro se petition for a writ of habeas corpus in federal district court. *See Pelfrey v. Buchanan*, S.D.Ohio No. 3:19-cv-59, 2019 WL 2717891, *1 (June 28, 2019) (*Pelfrey V*). In the federal habeas action, Pelfrey raised four grounds for relief, including, as pertinent here:

Ground One: Prosecutorial misconduct in violation of Pelfrey's Sixth and Fourteenth Amendment rights by (1) failing to clear up any testimony that he knew to be incorrect or misleading, (2) failing to disclose evidence favorable to the accused, and (3) knowingly making improper statements.

* * *

Ground Three: Pelfrey's convictions were based on insufficient evidence in violation of the Due Process Clause of Pelfrey's Fifth Amendment for failing to prove beyond a reasonable doubt every element of the crimes with which Pelfrey was charged. The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 [(1970)].

*Id.* at *1.

{¶ 17} A magistrate rejected the first ground because "Pelfrey's failure to present this claim on direct appeal procedurally defaulted the claim and the default is not excused by ineffective assistance of appellate counsel or actual innocence." *Id.* at *10. The magistrate rejected the other claims as well, because they were procedurally defaulted, stated no constitutional claim, or lacked merit. *Id.* at *11-19.

{¶ 18} After reconsidering the case based on Pelfrey's objections and the district court's recommitment, the magistrate found no reason to change its prior conclusions and again recommended that the case be dismissed with prejudice and that Pelfrey be denied a certificate of appealability (COA). *Pelfrey v. Buchanan*, S.D.Ohio No. 3:19-cv-59, 2019 WL 3766096, *5 (Aug. 19, 2019) (*Pelfrey VI*). On further review, the district court adopted the magistrate's judicial findings and denied Pelfrey a COA. *Pelfrey v. Buchanan*, S.D.Ohio No. 3:19-cv-59, 2019 WL 4602350, *1-2 (Sept. 23, 2019) (*Pelfrey VII*).

{¶ 19} On October 7, 2019, Pelfrey filed a motion for reconsideration in the federal district court and also appealed the September 23, 2019 decision to the Sixth Circuit Court of Appeals. The Sixth Circuit then stayed the appeal pending resolution of the motion for reconsideration. *See Pelfrey v. Buchanan*, S.D.Ohio No. 3:19-cv-59, 2020 WL 1181192, *1 and fn. 1 (Mar. 20, 2020) (*Pelfrey VIII*).

{¶ 20} On October 8, 2019, the magistrate in the district court case recommended denial of the motion for reconsideration. In addition to filing objections to the magistrate's decision, Pelfrey filed " 'newly discovered evidence' in the form of an Affidavit of Robert May." *Id.* at *1. According to the district court, "May accuses the assistant county prosecutor of conducting a flawed investigation and withholding exculpatory evidence." *Id.*

{¶ 21} On November 29, 2019, the magistrate struck the affidavit from the record because it was untimely. The magistrate further found that the affidavit "did not constitute 'newly discovered evidence,' given that Petitioner had known since March 31,

2014, that May was a material witness and Petitioner had not demonstrated due diligence in obtaining his Affidavit." *Id.* After Pelfrey filed objections, the district court agreed that Pelfrey had failed to establish due diligence. The court noted that "Petitioner has known that May was a material witness since the date of the criminal offense, nearly six years ago. Petitioner does not explain what efforts, if any, he or his attorneys made to obtain May's testimony either at the criminal trial or prior to filing his habeas petition or Motion for Reconsideration." *Id.* at *2. As a result, the court overruled the motion for reconsideration, rejected Pelfrey's request for a COA, and held that the case would remain terminated on the court's docket. *Id.* at *3.

**{¶ 22}** On July 21, 2020, the Sixth Circuit Court of Appeals rejected Pelfrey's appeal of the dismissal of his habeas claims. The court found that three of the claims ("regarding parol evidence, the sufficiency of the evidence to support his convictions, or [Pelfrey's] right to a speedy trial") had been abandoned because Pelfrey did not ask for a COA concerning those claims. *Pelfrey v. Buchanan*, 6th Cir. No. 19-3970, 2020 WL 5984754, *2 (July 21, 2020) (*Pelfrey IX*). The Sixth Circuit also found that Pelfrey had forfeited the prosecutorial misconduct claim in the district court because he had failed to address the magistrate's finding that the claim had been procedurally defaulted. *Id.* Therefore, the Sixth Circuit denied Pelfrey's request for a COA and to proceed in forma pauperis on appeal. *Id.* There is no indication that any further appeals were taken.

E. Return to State Court and the Current Proceedings

**{¶ 23}** Having failed in federal court, Pelfrey returned to state court on August 23,

2021, and filed a pro se motion for leave to file a motion for new trial based on newly discovered evidence under Crim.R. 33(A)(6). Additionally, Pelfrey raised prosecutorial misconduct under Crim.R. 33(A)(2) and (3), and accident or surprise under Crim.R. 33(A)(3). As support, Pelfrey attached 15 documents to his motion.

{¶ 24} On September 23, 2021, the State filed a memorandum in opposition to the motion, and Pelfrey then responded with a one-page motion for summary judgment. On October 7, 2021, the trial court overruled the motion for leave as well as Pelfrey's motion for summary judgment. Pelfrey filed a notice of appeal and now raises 16 assignments of error.

### III. Denial of Motion for Leave

{¶ 25} In responding to Pelfrey's assignments of error, the State contends that only two are relevant, i.e., whether the trial court erred in denying Pelfrey leave to file a motion for new trial and whether the court erred by denying the motion without holding a hearing. Appellee's Brief, p. 8. We agree with the State that only two assignments of error are pertinent. These are the first two assignments of error, which state as follows:

The Trial Court Erred in Overruling [Appellant's] Motion for Leave to File a Motion for New Trial Because the Court's Judgment Entry Made No Mention of Whether It Found That Appellant Was "Unavoidably Prevented" from Discovering the "Newly Discovered" Evidence.

The Trial Court Abused Its Discretion When It Denied [Appellant's] Motion for New Trial on the Basis of Newly Discovered Evidence Without

Conducting a Hearing to Determine Whether There is Clear and Convincing Evidence Proof of Unavoidable Delay, Because if a Defendant Submits Documents That on Their Face Supports His/Her Claim That He/She Was Unavoidably Prevented From Timely Discovering the Evidence, the Trial Court **Must** Hold a Hearing to Determine Whether There was Unavoidable Delay.

(Emphasis sic.)

**{¶ 26}** Before considering these assignments of error, we will discuss the standards for motions for leave to file a motion for new trial and for reviewing such motions.

### A. Applicable Standards

**{¶ 27}** Crim.R. 33(A) allows defendants to file motions for new trial based on causes that materially affect their substantial rights. As alleged here, these grounds include: "Misconduct of the jury, prosecuting attorney, or the witnesses for the state"; "Accident or surprise which ordinary prudence could not have guarded against"; and "newly discovered evidence" which "the defendant could not with reasonable diligence have discovered and produced at the trial." Crim.R. 33(A)(2), (3), and (6).

**{¶ 28}** Pelfrey mentioned these three grounds in his motion for leave, but his motion, in fact, focused only on newly discovered evidence. *See* Motion for Leave to File a Motion for New Trial (Aug. 23, 2021), p. 21-28.

**{¶ 29}** Under Crim.R. 33(B):

Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

{¶ 30} Clear and convincing evidence has been defined as "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 31} " 'In order to be able to file a motion for a new trial based on newly discovered evidence beyond the one hundred and twenty days prescribed in the above rule, a petitioner must first file a motion for leave, showing by "clear and convincing proof that he has been unavoidably prevented from filing a motion in a timely fashion." ' " *State v. Parker*, 178 Ohio App.3d 574, 2008-Ohio-5178, 899 N.E.2d 183, ¶ 16 (2d Dist.), quoting *State v. Morgan*, 3d Dist. Shelby No. 17-05-26, 2006-Ohio-145. *Accord State v. Harwell*, 2d Dist. Montgomery No. 28104, 2019-Ohio-643, ¶ 16. " '[A] party is unavoidably prevented from filing a motion for new trial if the party had no knowledge of the existence

of the ground supporting the motion for new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence.' " *Parker* at ¶ 16, quoting *State v. Walden*, 19 Ohio App.3d 141, 145-146, 483 N.E.2d 859 (10th Dist.1984). "[A] movant fails to demonstrate that he was unavoidably prevented from discovering new evidence when he would have discovered the information earlier had he exercised due diligence and some effort." *State v. Metcalf*, 2d Dist. Montgomery No. 26101, 2015-Ohio-3507, ¶ 11, citing *State v. Warwick*, 2d Dist. Champaign No. 01CA33, 2002-Ohio-3649.

{¶ 32} We review new trial motions for abuse of discretion. *State v. Beavers*, 2d Dist. Montgomery No. 22588, 2009-Ohio-5604, ¶ 23. "The term 'abuse of discretion' 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " *Id.*, quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). "Understandably, most instances in which abuses of discretion have been found have involved a determination that the trial court's decision is unreasonable, not that it is arbitrary or unconscionable." *Id.*, citing *AAAA Ents., Inc. v. Riverplace Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 33} With these standards in mind, we will review the trial court's decision.


B.   Review

{¶ 34} There is no question here that Pelfrey failed to file his motion within 120 days of the jury verdict. Consequently, he was required to show by clear and convincing evidence that he was unavoidably prevented from timely discovering the evidence on

which his motion relied.

{¶ 35} Pelfrey's motion was primarily based on the affidavit of Robert May, which was attached to Pelfrey's motion as Exhibit 13. In the affidavit, May states that he was with Pelfrey in Cincinnati, Ohio, at attorney Lester's office on March 31, 2014, from 12:00 p.m. to 3:00 p.m. Also there at that time were Judith Daniel and Eileen Cable, who waited outside in the car. *Id.* at p. 1. May further related that he was present with Pelfrey and Daniel at a bank on April 1, 2014, during which time he heard Daniel speak with a person over the phone about "how a mortgage loan on her home would work, what would happen if it does or does not get paid." *Id.* In addition, May said that he witnessed Daniel sign a POA and that Daniel gave him a copy of the POA, stating that she "can't afford a mortgage loan or the repairs/remodeling I want without him" (presumably referring to Pelfrey). *Id.* May also stated that the POA Daniel gave him on April 1, 2014, was the same POA that the State alleged had been forged. *Id.*

{¶ 36} According to Pelfrey, he lost touch with May in 2015 and attempted diligently to find him. Pelfrey further argues that he experienced significant difficulty in obtaining records from other sources that substantiated his "alibi" that he was in Cincinnati on March 31, 2014 (the day Daniel said she signed the POA) and substantiated that Daniel actually signed the POA on April 1, 2014. Pelfrey therefore argues that he could not have been guilty of altering the POA.

{¶ 37} The trial court's decision was not lengthy, but it indicated that the trial court was denying the motion for leave based on the reasoning in the State's memorandum. Entry and Order (Oct. 7, 2021), p. 1. We have previously found similar consideration

sufficient. *Parker*, 178 Ohio App.3d 574, 2008-Ohio-5178, 899 N.E.2d 183, at ¶ 20.   As in *Parker*, we find no fault with the trial court's decision.

{¶ 38} Specifically, Pelfrey has known of the facts surrounding his purported "alibi" since before the trial began.   Pelfrey was well aware of his own actions, including his alleged appointment in Cincinnati with an attorney and the identity of the bank and notary involved with the POA transaction.   Pelfrey could have presented this information at trial.   We also note that documents Pelfrey submitted with his motion for leave (Lester's letter to Pelfrey and information about the notary's presence at the bank) were dated in 2017, meaning that Pelfrey had these documents around four years before he filed his motion. *See* Exhibits 8 and 9 attached to Pelfrey's Motion for Leave to File a Motion for New Trial.

{¶ 39} Furthermore, even if we were to assume that May was a material witness, Pelfrey knew this as well, since May allegedly was with him on March 31 and April 1, 2014.   None of this is new evidence.   Additionally, Pelfrey filed May's affidavit with the federal court in early October 2019.   Pelfrey gave no reason why he failed for nearly two more years to file the motion for leave.

{¶ 40} May's affidavit also alleges some matters that involved investigation between 2019 and 2021.   Before considering these matters, we note the State's argument that May's affidavit is defective because it lacks a notary seal, stamp, printed name, and county where the act was performed, as the law requires.   Appellee's Brief at p. 15-16, citing R.C. 147.04 and R.C. 147.542(G).

{¶ 41} R.C. 147.04 requires notaries to obtain a seal, and R.C. 147.542(G) contains requirements for notarial certificates.   Under R.C. 147.542(G), notarial

certificates "shall show all of the following information: (1) The state and county venue where the notarization is being performed; (2) The wording of the acknowledgment or jurat in question; (3) The date on which the notarial act was performed; (4) The signature of the notary, exactly as shown on the notary's commission; (5) The notary's printed name, displayed below the notary's signature or inked stamp; [and] (6) The notary's notarial seal and commission expiration date."

{¶ 42} The notary certificate for May's affidavit fails to comply with R.C. 142.542(G)(1), (5), and (6). The most serious omission is that of the notary seal. Whether this defect prohibits any consideration of the affidavit depends on the law relevant to certification of affidavits.

{¶ 43} "An affidavit is a written declaration under oath, made without notice to the adverse party." R.C. 2319.02. "An affidavit may be used to verify a pleading, to prove the service of the summons, notice, or other process in an action; or to obtain a provisional remedy, an examination of a witness, a stay of proceedings, or upon a motion, and in any other case permitted by law." R.C. 2319.03. "As a general proposition, a jurat is merely a certificate which is intended to establish that the oath was duly administered by a duly authorized individual." *State v. Davies*, 11th Dist. Ashtabula No. 2012-A-0034, 2013-Ohio-436, ¶ 24, citing *Taxis v. Oakwood*, 19 Ohio Law Abs. 498, 1935 WL 1847 (2d Dist.1935). (Other citation omitted.)

{¶ 44} R.C. 147.452 is part of the Uniform Recognition Acknowledgments Act ("URAA"), which originally became effective in 1974. *Taylor v. Kemp*, 7th Dist. Belmont No. 05 BE 13, 2005-Ohio-6787, ¶ 36, referencing R.C. 147.51 - R.C. 147.58. *See also*

R.C. 147.58.   Before the URAA was adopted, Ohio courts had held that defects in jurats would be disregarded unless they were substantial.   *E.g., Stern v. Bd. of Elections of Cuyahoga Cty.*, 14 Ohio St.2d 175, 237 N.E.2d 313 (1968).   In *Stern*, the court stated that:

> A jurat is not part of an affidavit, but is simply a certificate of the notary public who administered the oath, and is prima facie evidence that the affidavit was properly executed and sworn to before such notary public on the date stated in such affidavit.

*Id*. at paragraph one of the syllabus.

{¶ 45} After the URAA was enacted, courts continued to find affidavits valid where they substantially complied with jurat requirements.   See *Chase Manhattan Mtge. Corp. v. Locker*, 2d Dist. Montgomery No. 19904, 2003-Ohio-6665, ¶ 24-27; *State ex rel. Stewart v. Clinton Cty. Bd. of Elections*, 124 Ohio St.3d 584, 2010-Ohio-1176, 925 N.E.2d 601, ¶ 28; *Sheflyand v. Schepis*, 8th Dist. Cuyahoga No. 95665, 2011-Ohio-2040, ¶ 24; *Hillman v. Larrison*, 10th Dist. Franklin No. 16AP-374, 2016-Ohio-7971, ¶ 6.

{¶ 46} Notably, as the URAA was originally enacted, the definition of "notarial acts" for purposes of R.C. 147.51 through R.C. 147.58 did not include jurats.   *See* R.C. 147.51 as enacted in 1973 H. 47, effective January 1, 1974.   However, effective September 20, 2019, R.C. 147.51 was amended to state that "For the purposes of sections 147.51 to 147.58 of the Revised Code, 'notarial acts' means acts which the laws and regulations of this state authorize notaries public of this state to perform, including the administration of oaths and affirmations, taking proof of execution and acknowledgment of instruments,

attesting documents, *and executing a jurat*." (Emphasized language added in 2019.) Sub. S.B. 263, 2018 Ohio Laws 121.

{¶ 47} As part of the same legislation, the legislature enacted R.C. 147.542, which contained language pertaining to both acknowledgments and jurats.[5] R.C. 147.542, as enacted, provided that:

(A) A notary public shall provide a completed notarial certificate for every notarial act the notary public performs.

(B) For an acknowledgment and a jurat, the corresponding notarial certificate shall indicate the type of notarization being performed.

{¶ 48} R.C. 147.011(D) defines a "notarial certificate" as "the part of, or attachment to, a document that is completed by the notary public and upon which the notary public places the notary public's signature and seal."[6] This statute also separately distinguishes between acknowledgments and jurats. *See* R.C. 147.011(A) and (C).

{¶ 49} Under R.C. 147.011(A), an "acknowledgement" is "a notarial act in which

---

[5] As originally enacted, the URAA did not contain a section 147.452. R.C. 147.452 was first enacted in 2017, but pertained solely to allowing notaries to use electronic communications to satisfy acknowledgement requirements. *See* Am.Sub.H.B. 49, 2017 Ohio Laws 24. However, shortly thereafter, the statute was repealed, effective February 20, 2018. *See* Sub.H.B. 31, 2017 Ohio Laws 36. The current version of R.C. 147.542 was then added in December 2018 as part of the Notary Public Modernization Act ("NPMA"), and became effective on September 20, 2019. *See* Sub.S.B. 263, 2018 Ohio Laws File 121.

[6] R.C. 147.011 is also part of the NPMA and became effective on September 20, 2019. *See* Sub. S.B. 263, 2018 Ohio Laws File 121. R.C. 147.011 was later amended, effective October 7, 2020, which was after May's affidavit was signed. *See* Sub.H.B. 263, 2020 Ohio Laws File 96. However, the only change was to eliminate subsection (C) (which is not relevant). This, in turn, caused former subsections (D) and (E) to become R.C. 147.011(C) and R.C. 147.011(D). The wording of these subsections did not change.

the signer of the notarized document acknowledges all of the following: (1) That the signer has signed the document; (2) That the signer understands the document; (3) That the signer is aware of the consequences of executing the document by signing it. In contrast, R.C. 147.011(C) defines a "jurat" as "a notarial act in which both of the following are met: (1) The signer of the notarized document is required to give an oath or affirmation that the statement in the notarized document is true and correct; (2) The signer signs the notarized document in the presence of a notary public."[7]

{¶ 50} As noted, R.C. 147.542(G) contains requirements for notarial certificates. Since this statute was not in effect before 2019, the issue is whether the mandatory use of the word "shall" changes traditional law indicating that substantial compliance for a jurat is sufficient.

{¶ 51} There is very little Ohio law discussing R.C. 147.542. In *State ex rel. White v. Franklin Cty. Bd. of Elections*, 160 Ohio St.3d 1, 2020-Ohio-524, 153 N.E.3d, the Supreme Court of Ohio considered the validity of notarized affidavits that had been presented to the board of elections to establish that signatures on nominating petitions were those of the persons listed on the petitions. *Id.* at ¶ 3. After the board invalidated the signatures, the candidate filed a petition for a writ of mandamus with the Supreme Court of Ohio. *Id.* at ¶ 5.

{¶ 52} During the case, the board argued that the documents the candidate had obtained were unsworn statements, not affidavits, and were insufficient to confirm that the people in question had signed the petition. *Id.* at ¶ 9. The Supreme Court of Ohio

---

[7] Again, this subsection was renumbered in 2020 from subsection (D) to (C). R.C. 147.011(A) was not affected.

agreed. Citing R.C. 147.04 and 147.542, the court stated that:

> The documents at issue here bear the notary public's stamp, but not her signature, and they contain no jurat of the notary public nor any other indication that the declarants had sworn to their statements or that they made their statements under oath.

*State ex rel. White v. Franklin Cty. Bd. of Elections*, 160 Ohio St.3d 1, 2020-Ohio-524, 153 N.E.3d 1, ¶ 13. The court did not discuss the concept of substantial compliance, but there was no need to do so, since the documents in question had substantial defects.

{¶ 53} The only other case to mention R.C. 147.542 is *Wallick Properties Midwest, LLC v. Mahdi Jama*, 10th Dist. Franklin No. 20AP-299, 2021-Ohio-2830. *Wallick* involved a settlement agreement requiring a landlord to do two things to obtain a writ of restitution. The landlord had to provide an affidavit and a photo of disallowed persons who had been on the premises. *Id.* at ¶ 2-3. After the agreement was in effect, the landlord provided a purported affidavit (without a photo) and obtained a writ of restitution. *Id.* at ¶ 5.

{¶ 54} The Tenth District Court of Appeals reversed the grant of the writ, because a photo was not provided, and because the affidavit was invalid. Concerning the latter point, the court noted that "a jurat certificate must expressly state that an oath or affirmation was administered to the signor and that the affiant signed the notarized document in the presence of the notary public." *Id.* at ¶ 14, citing R.C. 147.542(B) and R.C. 147.011(D). The court found that affidavit requirements had not been met because the affiant's signature was illegible and failed to identify the affiant. *Id.* at ¶ 15. In

addition, there was no evidence that the statement had been made under oath. *Id.* at ¶ 16.

{¶ 55} Like *White*, *Wallick* did not mention the issue of substantial compliance, but again there was no need, as the alleged affidavit was clearly defective. Therefore, these cases are not helpful concerning the effect of the 2019 amendments to the URAA.

{¶ 56} However, prior Ohio case law discussing the URAA does follow the approach of allowing enforcement where a defect is not substantial. Conversely, where a defect is substantial, the document will be ineffective. For example, in *PNC Bank, N.A. v. Camping & Edn. Found.*, 1st Dist. Hamilton No. C-990690, 2000 WL 331635 (Mar. 30, 2000), the court found amendments to a trust ineffective because they were not acknowledged as required by the URAA. Specifically, while the witnesses to the amendments were notaries, neither signed in that capacity. *Id.* at *2. Similarly, a transfer-on-death deed was held invalid where it did not substantially comply with R.C. 5301.01(A), R.C. 5302.22(A), and R.C. 147.53. *Fragola v. Graham*, 2016-Ohio-8281, 78 N.E.3d 277, ¶ 14 (9th Dist.).

{¶ 57} In another case, the court rejected a party's claim that an acknowledgement of executing a deed must be oral. The court noted that nothing in the caselaw or statutes required this, and that it would "discriminate against those with speech impairments." *Taylor*, 7th Dist. Belmont No. 05 BE 13, 2005-Ohio-6787, at ¶ 56. Similarly, in *Estate of Niemi v. Niemi,* 11th Dist. Trumbull No. 2008-T-0082, 2009-Ohio-2090, an error in a notary's acknowledgement language for a deed, while not in compliance with R.C. 147.541, was found to be inadvertent and not to invalidate the transfer. *Id.* at ¶ 68.

{¶ 58} Furthermore, in *Mid-Am. Nat. Bank & Trust Co. v. Gymnastics Internatl., Inc.*, 6 Ohio App.3d 11, 451 N.E.2d 1243 (6th Dist.1982), the court of appeals held that a mortgage was valid, as it substantially complied with R.C. 147.55, even though it did not contain the recitals stated in R.C. 147.53 and R.C. 147.54.   In this regard, the court stated that:

> R.C. 147.51 to 147.58 are modeled after the Uniform Recognition of Acknowledgments Act.   The purpose of the Uniform Act, as stated in the prefatory note of the National Conference of Commissioners on Uniform State Laws, 14 U.L.A. 197, is to establish a simplified and certain form for taking acknowledgments, both within and without the state, and to specify how acknowledgments and other notarial acts taken out of the state could be taken so as to be recognized in the enacting state.   R.C. 147.55 provides short forms of acknowledgments and expressly states that the forms are not mandatory.

*Id.* at 13-14.

{¶ 59} As indicated, jurats were not initially covered by the URAA, but were included in 2019.   At that time, a short form of a jurat was also allowed. *See* R.C. 147.551, as enacted by Sub.S.B. 263, 2018 Ohio Laws File 121, as part of the PNMA. R.C. 147.551 states that:

> Notwithstanding section 147.542 of the Revised Code, a jurat may take the following form:
>
> "State of Ohio

County of ...............

Sworn to or affirmed and subscribed before me by (signature of person making jurat) this date of (date).

(Signature of notary public administering jurat)

(Affix seal here)

(Title of * * * rank)

(Commission expiration date)"

**{¶ 60}** The jurat attached to May's affidavit fails to comply with the short form requirements as well, for the same reasons that it does not comply with R.C. 147.542(G). Nonetheless, since "substantial compliance" is sufficient, we cannot find, in view of the above authority, that the absence of the county, state name, or seal voids the affidavit. Specifically, in *Stern*, the absence of a seal did not cause a failure of substantial compliance. *Stern*, 14 Ohio St.2d 175, 237 N.E.2d 313, at paragraph two of the syllabus. Furthermore, while the jurat in *Stern* did contain the limits of the notary's jurisdiction, notaries today have jurisdiction throughout the state of Ohio. *See* R.C. 147.07.

**{¶ 61}** It is true that an affidavit can be declared invalid if an Ohio notary certifies an affidavit that is signed outside Ohio. *See Village of Harbor View v. Jones*, 10th Dist. Franklin No. 10AP-356, 2010-Ohio-6533, ¶ 57 and fn. 8 (invalidating affidavit signed by an individual in Colorado that was taken and certified by an Ohio notary). However, the

State did not argue in the trial court that this had occurred.[8]

{¶ 62} Accordingly, we disagree with the State's position that May's affidavit cannot be considered. While defective in a few ways, the jurat is still in substantial compliance.

{¶ 63} Nonetheless, there is an additional reason to discard the affidavit, or at least the parts of it that refer to May's actions between June 2019 and July 2021. According to the affidavit, May allegedly found evidence establishing that the prosecuting attorney trying Pelfrey's case "crossed the line from gross negligence to recklessness." Ex. 13 (May Affidavit), at p. 2. After making this statement, May lists various acts of the prosecutor's alleged misconduct prior to and during Pelfrey's case, and one action that appears to have occurred after trial (alleged participation in a decision of the "Victim Services and the Ohio Department of Rehabilitation and Correction" ("ODRC") to restrict Pelfrey's prison correspondence with family and friends "for the sole purpose of depriving Mr. Pelfrey of the ability or funds to uncover the truth." *Id.* at p. 2.

{¶ 64} It is unclear what correspondence issue May is referencing, as his affidavit does not elaborate further. However, Pelfrey's motion for leave contains an Ex. 12, which is a January 11, 2018 ODRC order to Pelfrey to cease contact with two women who had said they did not want to receive correspondence from him. One of the women was the victim, Daniel. The record does not indicate the other woman's relationship to

---

[8] The individual who notarized Pelfrey's affidavit is also listed on the website of the Ohio Secretary of State as an active non-attorney notary with a commission between February 5, 2018 and February 4, 2023, which is the expiration date listed on Ex. 13. *See* https://notarysearch.ohiosos.gov/ords/f?p=ENSEARCH:SEARCH:1186499899571::NO: RP:: (accessed Feb. 25, 2022). As noted in fn. 4, we may take notice of records that are accessible online.

Pelfrey. Assuming for the sake of argument that this is the correspondence May referenced, this part of the affidavit is invalid, as there is no indication that May has personal knowledge of these matters. This is also true of the other acts of prosecutorial misconduct that May alleged.

{¶ 65} "As an affidavit is a form of giving testimony, the affiant must be competent to testify at trial to the facts stated in the affidavit." *Wallick*, 10th Dist. Franklin No. 20AP-299, 2021-Ohio-2830, at ¶ 18. "A witness may not testify in a case 'unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.' " *Id.*, quoting Evid.R. 601.

{¶ 66} " 'Personal knowledge' is '[k]nowledge gained through firsthand observation or experience, as distinguished from a belief based on what someone else has said.' " *Bonacorsi v. Wheeling & Lake Erie Ry. Co.*, 95 Ohio St.3d 314, 2002-Ohio-2220, 767 N.E.2d 707, ¶ 26, quoting *Black's Law Dictionary* 875 (7th Ed.Rev.1999). Thus, " '[a] witness is "incompetent" to testify to any fact unless he or she possesses firsthand knowledge of that fact.' " *Id.*, quoting Weissenberger, *Ohio Evidence*, Section 602.1, at 213 (2002).

{¶ 67} Any "evidence" that May obtained was not based on his own firsthand knowledge, i.e., what he had witnessed; it was instead based on what he had been told by someone else. May also failed to produce any such "evidence." His affidavit consists of generalized statements about what the prosecutor did.

{¶ 68} Accordingly, even if May's affidavit substantially complied with R.C. 147.542(G) or R.C. 147.551, it still did not provide a basis for granting leave to file a

motion for new trial.

{¶ 69} Pelfrey also contends that the trial court was required to hold a hearing on his motion for leave to file a motion for new trial. This is incorrect.

{¶ 70} "We have held that a defendant is entitled to such a hearing if he submits 'documents that on their face support his claim that he was unavoidably prevented from timely discovering the evidence' at issue." *State v. McConnell*, 170 Ohio App.3d 800, 2007-Ohio-1181, 869 N.E.2d 77, ¶ 19 (2d Dist.), citing *State v. York*, 2d Dist. Greene No. 1999-CA-54, 2000 WL 19243 (Feb. 18, 2000). (Other citations omitted.) However, if the submitted documents do not establish unavoidable delay, the trial court is not required to hold an evidentiary hearing. *State v. Bush*, 10th Dist. Franklin No. 08AP-627, 2009-Ohio-441, ¶ 12; *Parker*, 178 Ohio App.3d 574, 2008-Ohio-5178, 899 N.E.2d 183, at ¶ 21.

{¶ 71} Because Pelfrey's motion failed to establish that his delay in filing was due to unavoidable delay, the trial court did not abuse its discretion in failing to hold an evidentiary hearing.

{¶ 72} Based on the preceding discussion, the first two assignments of error are overruled.


IV. Remaining "Assignments of Error"

{¶ 73} The remaining assignments of error are irrelevant or subsumed in our rejection of the first two assignments or error. These assignments of error, listed in order, are as follows:

3. The Trial Court Erred by Refusing to Grant a New Trial on the

Basis of Newly Discovered Evidence When That Evidence Showed That [the Victim and Appellant] Were Not In Oakwood on the Date and Time When [the Victim] Testified That She Had Allegedly Signed the Power of Attorney to Establish the Forgery Offense at Trial.

4.   The Discovery Prejudiced [Appellant] by Not Providing Evidence Material to His Guilt or Punishment in Violation of His Right to a Fair Trial.

5.   The Bill of Particulars Prejudiced [Appellant] by Providing Only General Terms in Violation of His Right to a Fair Trial.

6.   [Appellant's] Conviction Was Plain Error.

7.   The State Committed Prosecutorial Misconduct by Intentionally Withholding the Date Establishing the Basis of the Alleged Criminal Offenses Until Mid-Trial, So [Appellant] Could Not Adequately Present a Defense, Much Less His Alibi Defense.

8.   The State Committed Prejudicial Misconduct by Becoming Aware of the Newly Discovered Evidence and Failing to Seek Justice When There Was Information That Cast Doubt on the Correctness of the Conviction.

9.   The State Committed Prosecutorial Misconduct by Conducting an Inadequate Investigation in September 2015 Before Bringing Charges.

10.   The State Committed Prosecutorial Misconduct by Tampering With a Witness in September 2015 Before Bringing Charges.

11.   The State Committed Prosecutorial Misconduct by Obtaining,

Manufacturing, Coercing, or Fabricating False Evidence from Daniel (a Witness He Knew Was Not Complicit to the Falsehood) Before Bringing Charges.

12. The State Committed Prosecutorial Misconduct by Suborning Perjury at the Grand Jury Proceedings and the Trial.

13. The State Committed Prosecutorial Misconduct by Misrepresenting the Facts and Evidence as He Knew Them (Through a Witness He Knew Was Not Elicit [sic] to the Falsehood).

14. Making False Statements of Fact and Law in Predisposition Proceedings and Rebuttal Summation at Trial.

15. The State Committed Prosecutorial Misconduct by Impeding [Appellant's] Persistent Efforts Before, During, and After His Criminal Trial, to Track Down Evidence of His Innocence.

16. Appellant Is Actually Innocent.

{¶ 74} As noted, these assignments of error are repetitive or are subsumed within consideration of the first two assignments of error, which deal with the refusal of leave to file a motion for new trial. Because we will affirm the trial court's decision for the reasons stated in our discussion of the first and second assignments of error, the remaining assignments of error are overruled.

{¶ 75} As a final matter, many of these assignments of error would be barred by res judicata in any event, because they involve matters that were raised on direct appeal, could have been raised on direct appeal, or have already been litigated. *See State v.*

*DeVaughn*s, 2018-Ohio-1421, 110 N.E.3d 922, ¶ 21 (2d Dist.); *State v. Hayden*, 2d Dist. Montgomery No. 27589, 2017-Ohio-9308, ¶ 6.

## V. Conclusion

**{¶ 76}** All of Pelfrey's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

DONOVAN, J. and EPLEY, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Elizabeth A. Ellis
Gregory D. Pelfrey
Hon. Timothy N. O'Connell, Administrative Judge